## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

WESLEY MACGREGOR,

Defendant.

Crim. No. 19-10141-LTS-2

## MACGREGOR'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12(B)

### INTRODUCTION

Wesley MacGregor, a former employee of the Massachusetts Trial Court, was charged with obstruction of justice and conspiracy to obstruct justice, for conduct arising out of his duties as a state court officer. The indictments in this case charge MacGregor federally for alleged actions that fall wholly within his scope of duties as a state court officer.  The indictments which are the subject of this motion, allege that Court Officer MacGregor conspired with Judge Shelly Joseph and an unnamed defense attorney to enable an undocumented person to evade a civil detainer issued by U.S. Immigration and Customs Enforcement ("ICE").  According to the indictment, Court Officer MacGregor's conduct in opening a back door to the courthouse comprised the crimes of (1) obstruction of justice, 18 U.S.C. § 1512(c)(2); obstruction of a federal proceeding, *id.* § 1505; and § 1505 (3) conspiracy to obstruct justice, *id.* § 1512(k).

This prosecution is contrary to the plain language of the federal obstruction statutes and the fundamental constitutional principles that underlie our federal system of dual sovereignty. This prosecution also violates due process protections against criminalizing conduct as to which no one—let alone a state court officer —could possibly have had fair notice.  No one would have

envisioned that a statute that prohibits "corruptly obstructing an official proceeding" would have been applied to the way in which a state court employee conducts his daily tasks. Criminalizing this state conduct violates the Tenth Amendment's "anti-commandeering" principle, recently reaffirmed in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). The federal government certainly can request that a state court officer surrender a state court custody to a civil immigration warrant, but the government cannot demand such action, and certainly should not criminalize the state court officer's conduct in releasing the state court custody prior to the Department of Homeland Security's execution of their civil immigration warrant.

Court Officer MacGregor denies the allegations in these indictments and files this Motion to Dismiss pursuant to Federal Rule of Criminal Procedure 12(b) to raise legal challenges to the face of the indictment because the question here is one of law, not fact. Regardless of whether the government's version of facts in these indictments were correct, or conversely, whether MacGregor's Grand Jury testimony is the correct version of facts, under either scenario, the acts alleged in the indictments do not qualify as obstruction of justice, or obstruction of a federal proceeding, within the meaning of 18 U.S.C. §§ 1505 and 1512(c)(2)—and if they did, MacGregor's prosecution would violate bedrock constitutional principles.

## BACKGROUND

### A.    Legal Framework

Under our federal system, "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). While the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," *id.* at 394, the states retain primary authority for "enforcing the criminal law," including the administration of their own criminal-justice systems, *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995). Federal law defines the respective roles and responsibilities of the

federal and state governments in contexts where these powers intersect.  Enforcement of the immigration laws has been delegated by Congress to the Department of Homeland Security ("DHS"); adjudication of immigration proceedings to the Department of Justice.  *Arizona*, 567 U.S. at 397.  Thus, Congress delegated to DHS—specifically, ICE an agency housed within it— the task of "conduct[ing] criminal investigations involving the enforcement of immigration-related statutes," *id.*, including the arrest of persons believed to be in the United States unlawfully.  By contrast, Congress delegated to the Justice Department responsibility for conducting removal proceedings; in these proceedings, a DHS attorney acts as a prosecutor, arguing before an immigration judge employed by the Justice Department, with authority to issue final orders of removal.  *See* 8 U.S.C. § 1103(g).

In terms of the states' role in immigration enforcement, although ICE may seek the ***voluntary*** cooperation of state and local governments in enforcing federal immigration law, *see id.* at 408-409; 8 U.S.C. § 1357(g), it may not—consistent with the Tenth Amendment, *see Printz v. United States*, 521 U.S. 898, 935 (1997)—*command* state and city officers to provide such assistance.  States, cities, and their officers retain the option to "decline to administer" federal immigration law.  *New York v. United States*, 505 U.S. 144, 176-77 (1992).

That the federal government is limited to the voluntary cooperation of state officials in enforcing immigration law was recently reemphasized by the Massachusetts Supreme Judicial Court in *Lunn v. Commonwealth*, 477 Mass. 517 (2017).  *Lunn* concerned whether state judicial officers had the authority to hold persons who would otherwise be released from state custody on a "civil immigration detainer"—a request from the federal government to hold such a person for up to 48 hours to allow ICE to apprehend him or her.  *Id.* at 518; *see* 8 C.F.R. § 287.7(a).  The SJC held that state judicial officers lacked that authority.  *Id.* at 519.  "Federal immigration

detainers," the SJC explained, "by their express terms[,] are simply requests.  They are not commands, and they impose no mandatory obligations on the State authorities to which they are directed."  *Id.* at 526.  That conclusion followed, the SJC continued, from the Tenth Amendment, which "prohibits the Federal Government from compelling States to employ their resources to administer and enforce Federal programs," *id.* at 526-527, as well as the text of the relevant regulations.  *Accord Philadelphia v. Att'y Gen.*, 916 F.3d 276, 281 (3d Cir. 2019).  The SJC further held that no other law, state or federal, permitted Massachusetts judicial officers to hold in custody people who are suspected only of violating federal civil immigration law.  *Id.* at 537.  After *Lunn*, such officers may not hold such people "beyond the time that [they] would otherwise be entitled to be released from State custody."  *Id.*

In the wake of *Lunn*, the Massachusetts state courts adopted a policy generally declining to assist the federal government in enforcing federal immigration law.  *See* Memorandum from Chief Justice Paula M. Carey, Policy and Procedures Regarding Interactions with the Department of Homeland Security (Nov. 10, 2017) (Exhibit A) ("Policy").[1]  This policy memorandum binds all state-court employees, including court officers, like MacGregor.

The memorandum implements *Lunn* by instructing employees not to "hold any individual who would otherwise be entitled to release based solely on a civil immigration detainer or civil immigration warrant."  *Id.* at 1.  It directs court employees to generally treat DHS officers "in the same manner" as members of the public, and states that a person who is brought into court in custody and then released shall be processed "in the normal course," even if he or she "is subject to a civil immigration detainer or warrant."  *Id.* at 2.  Although it sets out a

---

[1] The Court may take judicial notice of the policy in adjudicating this motion to dismiss, as it was incorporated by reference into the Indictment.  *See* Indictment ¶12; *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013).

procedure by which DHS officers may obtain access to the courthouse's "holding cell area in order to take custody of" a person pursuant to a detainer, such access is contingent on the DHS officer making such a request. *Id.* at 2-3. The policy provides, as a general matter, that DHS officials may enter and conduct activities in state courthouses only if "their conduct in no way disrupts or delays court operations[] or compromises court safety." *Id.* at 2. Pursuant to this policy, at the time of the events alleged in the indictment, the Newton District Court had established a policy excluding from state courtrooms DHS officers present to execute immigration detainers. *Cf. Ryan*, 382 F. Supp. 3d at 160-161 (describing evidence that DHS policies authorizing courtroom arrests have led to "victims and witnesses … avoid[ing] using the state courts, leading to a failure of state civil and criminal proceedings").

### B.    Factual Background

The indictments allege that on April 2, 2018, Wesley MacGregor conspired with Judge Shelly Joseph and with an unnamed defense attorney to allow a state court detainee, identified as A.S. in the indictment, to exit the courthouse from a door at the rear of the building, near the lockup where his personal effects had been left prior to the hearing, rather than through the front doors of the courtroom where ICE could have more easily apprehended him. Ind. ¶¶ 26-33.

A.S. appeared before Judge Joseph on April 2, 2018 on charges of narcotics possession and being a fugitive from justice. Ind. ¶ 6. After his arrest two days prior, A.S.'s fingerprints were run through an ICE database, and ICE issued both a civil detainer and a civil immigration warrant for his arrest. *Id.* at ¶¶ 6-8. The basis for the civil detainer and the civil warrant was ICE's belief that A.S. was previously removed from the United States and re-entered. *Id.* at ¶ 7.[2]

---

[2] According to the indictment, the detainer "requested that Newton Police (i) notify ICE prior to any release of A.S.; (ii) relay the Detainer to any other law enforcement agency to whom Newton Police transferred A.S.; and (iii) maintain custody of A.S. for up to 48 hours for ICE to take custody." *Id.* at ¶ 8. Neither the detainer nor the warrant *instructed* state or local officers to

Both the assistant district attorney ("ADA") and A.S.'s attorney raised serious questions about A.S.'s identity. *See* Ind. ¶¶ 20-22.[3] Specifically, the ADA and the defense attorney agreed that there was insufficient evidence to proceed with the state fugitive-from-justice charge, which would be dismissed. *Id.* at ¶ 22. The Commonwealth also agreed that it would not seek pretrial confinement on the drug possession charge. *Id.* at ¶ 20. At that point, neither Judge Joseph nor court officer MacGregor had the authority to detain A.S. *See Lunn*, 577 Mass. at 528-537.

Judge Joseph, still on the bench, conferred with counsel about the prospect that ICE might detain A.S. Ind. ¶ 20. The courtroom recording system captured part of the conversation before Judge Joseph—according to the indictment—directed that the system be turned off for approximately 52 seconds. *Id.* at ¶¶ 20-21. When it resumed, defense counsel asked to speak with A.S. in the lockup with an interpreter, while he retrieved his personal property. *Id.* at ¶ 22.

Then, according to the indictment, the following exchange occurred:

Court Officer MacGregor: Is he released Mr. Clerk?

Clerk:  What's that?

Court Officer MacGregor: He's released?

Clerk: He is.

Defense Attorney Yep.

---

take any action, nor could they have. *See supra* pp. 4-5; *Lunn*, 477 Mass. at 526 ("Federal immigration detainers … are simply requests.").

[3] At a sidebar conference with Judge Joseph, the ADA said, "I don't think it's him." The defense attorney reported: "There's 13 FBI numbers connected to this social. So something's bad with [unintelligible]." When the parties returned from sidebar, the defense attorney stated on the record: "We don't believe that this gentleman is the same gentleman as on the fugitive-from-justice warrant." The ADA agreed: "Your Honor, with the information I have, I don't think there is enough tying him to the Pennsylvania warrant." *Id.* at ¶¶ 20, 22.

Judge Joseph: He is, Um, {Defense Attorney} asked if the interpreter can accompany him downstairs, um to further interview him.

Defense Attorney: Yes, please.

Judge Joseph: - and I've allowed that to happen

(2:54 PM) Paragraph 22

Immediately following this proceeding, the indictment alleges that MacGregor escorted A.S. from Judge Joseph's courtroom to the lockup together with the Defense Attorney and the interpreter. The indictment alleges that once inside the lockup, MacGregor used his state issued security pass to open the rear sally port exit and release A.S. out the sally port door in the back of the courthouse. MacGregor does not dispute that he opened the sally port door and released A.S.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant may "raise[] by pretrial motion" any "defect in the indictment or information, including … failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  *See United States v. Brissette*, 919 F.3d 670, 675-76 (1st Cir. 2019); *United States v. Musso*, 914 F.3d 26, 29-30 (1st Cir. 2019).  Such a motion is the proper way to test the sufficiency of an indictment "as a matter of law."  *Id.* at 30; *see Brissette*, 919 F.3d at 676 ("[A] pretrial dismissal is essentially a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." (emphasis in original)). On a motion to dismiss under Rule 12(b), "[t]he indictment's allegations are assumed to be true," *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014), and the court asks whether, "[o]n the facts presented," the indictment is sufficient to state an offense, *Musso*, 914 F.3d at 30.

## ARGUMENT

## I.    THE INDICTMENT DOES NOT STATE AN OFFENSE UNDER SECTION 1505 OR SECTION 1512

Here, the text of the statutes plainly does not criminalize Court Officer MacGregor's conduct.  The plain text of the statute coupled with the conduct alleged in the indictment fail to establish that Court Officer MacGregor violated those statutes in three distinct ways. First, § 1505 and § 1512(c)(2) each criminalize only "corrupt" behavior, and the indictment does not allege any corrupt intent on the part of Court Officer MacGregor. Second, the two statutes likewise apply only where a defendant's conduct obstructs a "proceeding," and the execution of a civil immigration warrant does not qualify.  Finally, § 1512(c)(2) does not apply here at all, as it is limited to crimes relating to acts of evidence impairment.  The indictment thus fails to state an offense under both 8 U.S.C. §§ 1505 and 1512(c)(2).[4]

### A.    Court Officer MacGregor Did Not Act "Corruptly" For The Purposes Of Sections 1505 and 1512(c)(2)

First, both obstruction statutes that Court Officer MacGregor is charged with violating apply only to those who act "corruptly."  8 U.S.C. §§ 1505, 1512(c)(2).  But the indictment does not allege—beyond a bare recitation of the statute—that Court Officer MacGregor acted corruptly within the meaning of the statutes.

Both obstruction statutes limit their application to persons who act "corruptly."  *See* 8 U.S.C. §§ 1505, 1512(c)(2).[5]  The statutes define that term—at least as it is used in § 1505—to

---

[4] Because the indictment fails to state an offense under the substantive crimes with which Court Officer MacGregor is charged, it necessarily fails to state an offense under § 1512(k) and § 2, which allege a conspiracy to commit the substantive offenses.  *See Krulewitch v. United States*, 336 U.S. 440, 447 n. 4 (noting that conspiracy involves a "criminal object").

[5] Section 1505 also makes it a crime to obstruct justice "by threats or force, or by any threatening letter or communication."  18 U.S.C. § 1505.  The indictment does not allege any such acts on the part of Court Officer MacGregor.

mean "acting with an improper purpose, … including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." *Id.* § 1515(b). Although the statute provides that this definition applies only to § 1505, courts have generally read the term "corruptly" in § 1512(c)(2) to take essentially the same meaning: motivated by an "improper purpose." *See, e.g.*, *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013); *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007).[6] These definitions impose a high bar: As the Supreme Court has explained, the words "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). At the very least, that these statutes reach only those who act "corruptly" limits the statutes' application to those who are "conscious of their wrongdoing." *Id.*

The indictment entirely fails to allege that Court Officer MacGregor acted "corruptly." Setting aside the bare recitation of the statutory elements, *see* Ind. ¶¶ 38, 40, 42; *United States v. Murphy*, 762 F.2d 1151, 1153 (1st Cir. 1985) (indictment must do more than "parrot[] the statute"), the only reference made to motive in the indictment is in Paragraph 25, which alleges that "[i]t was the object of the conspiracy to corruptly attempt to obstruct" an immigration removal proceeding. Ind. ¶ 25. But this allegation likewise fails to shed light on how Court Officer MacGregor is alleged to have acted "corruptly" on April 2, 2018.

The indictment alleges that "defendant JOSEPH and the Defense Attorney discussed devising a way to have A.S. avoid being arrested by the ICE Officer. Defendant JOSEPH

---

[6] Section 1515(b) was enacted in 1996 with the express purpose of overriding the D.C. Circuit's decision in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which gave the term—as used in § 1505—a significantly narrower reading. The legislative history of the 1996 bill suggests that Congress specifically intended to "bring [§ 1505] back in line with other obstruction statutes." Hearing on S. 1734 Before the S. Comm. on the Judiciary, 104th Cong., 2d Sess., at 5 (May 4, 1996) (statement of Sen. Levin).

ordered that the ICE Officer be prevented from entering the downstairs Courthouse lockup area. After ordering A.S.'s release, defendant JOSEPH ordered that A.S. be returned downstairs to the lockup for the Defense Attorney to "further interview" A.S., which, in reality was a pretext to allow A.S. to access the rear sally-port exit in order to avoid the ICE officer." Ind. ¶¶ 30-32.

The only conduct Court Officer MacGregor is alleged to have participated in is that "[o]nce A.S. was returned downstairs to the lockup, defendant MACGREGOR used his security access card to open the sally-port exit and release A.S. from the back door of the Courthouse, contrary to NDC custom and practice." Ind. ¶ 33. Therefore, the government's theory appears to be that Court Officer MacGregor acted "corruptly" merely by "preventing the ICE Officer from taking custody of A.S" by opening the back sally port door, without even alleging Court Officer MacGregor's alleged conduct was for the purpose of assisting A.S. to avoid ICE. Instead, the indictment simply alleges Court Officer took the action of opening the sally-port door *knowing* it would "prevent[] the ICE Officer from taking custody of A.S." Ind. ¶ 25. But the term "corruptly" cannot be defined so broadly. *See Arthur Andersen*, 544 U.S. at 705 (contrasting the term "knowing" with the term "corruptly").

### B. Court Officer MacGregor's Alleged Actions Did Not Obstruct Or Interfere With A "Proceeding" For The Purposes Of Sections 1505 and 1512(c)(2)

The indictment fails to state an offense in a second way: It does not sufficiently allege that court Officer MacGregor obstructed a "proceeding"—a required element of both statutes.

Section 1505 applies only to a person who "corruptly obstructs, influences, or impedes … [a] *pending proceeding* … before any department or agency of the United States." 18 U.S.C. § 1505 (emphasis added). The "proceeding" that Court Officer MacGregor is alleged to have obstructed was "a federal immigration removal proceeding before the … Department of

Homeland Security." Ind. ¶ 42.  But as the indictment's own allegations make clear, there was

no removal proceeding "pending" at the time of Court Officer MacGregor's alleged conduct.

Under the INA, the term "removal proceeding" has a specific meaning: a proceeding held

before "[a]n immigration judge"—a Justice Department employee—"for deciding the

inadmissibility or deportability of an alien."  8 U.S.C. § 1229a(a)(1).  The statute likewise

specifies when a removal proceeding is "[i]nitiat[ed]": it is when "written notice" (known as a

"notice to appear") is "given in person to [an] alien" informing him or her of various aspects of

the proceeding, including "[t]he nature of the proceedings" and "[t]he legal authority under

which the proceedings are conducted."  *Id.* § 1229(a)(1); *see Pereira v. Sessions*, 138 S. Ct.

2105, 2110-2111 (2018); 8 C.F.R. § 1003.14(a).  Removal proceedings are thus analogous to

court proceedings, and they are triggered by the issuance of the "notice to appear"—itself

analogous to a charging document.  But the allegations in the indictment make plain that, on the

morning of April 2, 2018, no such proceeding was extant.  The indictment reflects that, as of

April 2, 2018, ICE had issued a federal immigration detainer and a civil immigration warrant for

A.S.'s arrest.  Ind. ¶ 8.  No "removal proceeding" was "pending."[7]

The government cannot escape that conclusion by attempting to recast the ICE agent's

actions on April 2 as part and parcel of some broader, more nebulous "proceeding."  For one, and

contrary to the indictment, DHS does not conduct "federal immigration removal proceedings";

the Justice Department does.  *See* 8 U.S.C. § 1229a(a)(1).  And even if the statutory scheme did

---

[7] The indictment implies that A.S. may have been eligible for an expedited form of
proceedings in which the government simply *reinstates* a previously issued removal order.  *See*
Ind. ¶ 8; *see also* 8 U.S.C. § 1231(a)(5).  Even if true, the fact that ICE could have removed A.S.
from the United States *without* instituting removal proceedings hardly helps the government now
establish that Court Officer MacGregor obstructed a pending "federal immigration removal
proceeding."  Ind. ¶¶ 38, 40, 42.  If no such proceeding would ever have occurred, one can
hardly say that Court Officer MacGregor obstructed such a proceeding.

permit the government to recast the events of April 2, 2018—in essence, the execution of a civil arrest warrant—as a "proceeding," the case law would not.  As multiple courts have held in the context of both § 1505 and § 1512 charges, the word "proceeding"—at least as it is used in the federal obstruction statutes—implies a formal, court-like proceeding, in the sense of "formal appearances before a tribunal." *United States v. Ermoian*, 727 F.3d 894, 899 (9th Cir. 2013); *accord United States v. Ramos*, 537 F.3d 439, 462-463 (5th Cir. 2008).  These courts have correctly looked to the structure of the statute, and the context in which the word "proceeding" appears, to conclude that Congress did not use the word in its "general sense," but rather "as a legal term." *Ermoian*, 727 F.3d at 899; *see also United States v. Higgins*, 511 F. Supp. 453, 455-456 (W.D. Ky. 1981) (consulting the legislative history of § 1505 to reach the same conclusion).  Thus understood, the word "proceeding" does not encompass "a mere criminal investigation," *Ermoian*, 727 F.3d at 900, and neither does it include the execution of an ICE arrest warrant. *Accord United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) ("For an investigation to be considered a proceeding … it must be more than a mere police investigation….").

For similar reasons, the indictment fails to state an offense under § 1512(c)(2).  That statute makes it a crime to "obstruct[], influence[], or impede[] any official proceeding."  8 U.S.C. § 1512(c)(2).  The term "official proceeding" is defined elsewhere to include, as relevant here, "a proceeding before a Federal Government agency," *id.* § 1515(a)(1)(A), and again the indictment specifies the "proceeding" that Court Officer MacGregor is alleged to have obstructed: "a federal immigration removal proceeding before the United States Department of Homeland Security."  Ind. ¶¶ 40, 42.  Section 1512(c)(2) is limited to "official proceedings," and—for the same reasons as above—the execution of an arrest warrant does not qualify as an official proceeding.  *See Ermoian*, 727 F.3d at 899; *Ramos*, 537 F.3d at 462-463.

Judge Ponsor's decision in *United States v. Binette*, 828 F. Supp. 2d 402 (D. Mass. 2011), is instructive. In *Binette*, the Securities and Exchange Commission began an investigation into the defendant's purchase of stock options. *Id.* at 403. When the defendant lied to the SEC investigators, they charged him with violating § 1512(c)(2). *Id.* at 402. The question for the Court was whether the investigation qualified as an "official proceeding" under § 1512(c)(2). *Id.* at 403. Judge Ponsor concluded that it did not, and dismissed the charge. *Id.* at 404. Relying on the Fifth Circuit's decision in *Ramos*, he reasoned that the statutory definition "indicates that it 'involves some formal convocation of the agency in which parties are directed to appear'" and was used throughout the statute "in 'a manner that contemplates a formal environment in which persons are called to appear or produce documents.'" *Id.* (quoting *Ramos*, 537 F.3d at 462-63). The investigation at issue, the court explained, "was not an official proceeding as contemplated by the statute," especially in light of its informal nature: In the kind of investigation at issue in *Binette*, the SEC could not "compel the production of documents and witnesses through subpoenas," as could a court. *Id.* The same is self-evidently true of an ICE officer who is executing a civil immigration warrant; such an officer does not have the power to compel process. The allegations in the indictment make clear that the "proceeding" that Court Officer MacGregor is alleged to have obstructed was not a formal convocation but a law-enforcement-style effort to apprehend and detain someone whom ICE suspected to be undocumented. That process does not qualify as a "proceeding" under the statute.

### C.    Section 1512(c)(2) Is Limited To Crimes Relating To Acts of Evidence Impairment

Finally, and wholly independently, the § 1515(c)(2) charge should be dismissed on the ground that that section was never meant to reach conduct like that charged in the indictment; it was intended to reach only crimes relating to acts of evidence impairment.

Unlike § 1505, which generally prohibits the obstruction of justice during a pending proceeding before a federal agency, § 1512, by its text, criminalizes a number of specific acts that center on (as the title of the provision indicates) "[t]ampering with a witness, victim, or … informant."  The statute criminalizes, for instance, the killing of a witness, 8 U.S.C. § 1512(a); the destruction or alteration of documentary or physical evidence, *id.* § 1512(c)(1); and the harassing of a witness in order to hinder his or her testimony, *id.* § 1512(b).  Section 1512(c), which Court Officer MacGregor is charged with violating, was added to the statute in 2002 as part of the Sarbanes-Oxley Act.  *See* Pub. L. No. 107-204, tit. XI, § 1102, 116 Stat. 807.  Its legislative history indicates that it was intended to close a perceived loophole with respect to "document shredding."  148 Cong. Rec. S6545 (July 10, 2002) (Sen. Lott); *see also id.* at S6549-S6550 (Sen. Hatch).  And the first subsection of § 1512(c), as indicated above, reflects that purpose:  It makes it a crime to "alter[], destroy[], multilate[], or conceal[] a record, document, or other object … with the intent to impair the object's integrity or availability for use in an official proceeding."  8 U.S.C. § 1512(c)(1).

Section 1512(c)(2)—the subsection which Court Officer MacGregor is charged with violating—is drafted more expansively.  That section makes it a crime to "otherwise obstruct[], influence[], or impede[] any official proceeding."  *Id.* § 1512(c)(2).  But, as the Supreme Court has instructed, when Congress sets out a list of specific acts that constitute a crime, and then follows that enumeration with a "residual" clause (like § 1512(c)(2)), the residual clause should be read through the lens of the enumerated examples.  *See Yates v. United States*, 135 S. Ct. 1074, 1085-1087 (2015); *Begay v. United States*, 553 U.S. 137, 142-143 (2008).  As the Court emphasized, if Congress meant the residual clause to wholly subsume the enumerated examples, "it is hard to see why it would have needed to include the examples at all."  *Id.* at 142.  The same

is true of § 1512(c)(2): If that section applies to *all* "otherwise" obstructive acts, there would be no need for the remainder of the statute.  The proper reading is that § 1512(c)(2) is limited—like the surrounding examples—to acts involving the destruction or impairment of evidence.  Indeed, the current Attorney General of the United States has articulated exactly this position. *See* Memorandum from Bill Barr to Deputy Att'y Gen. Rod Rosenstein at 2 (July 8, 2018), *available at* https://bit.ly/2TQIWNq (warning that the government should not give § 1512(c)(2) an "unbounded interpretation" by applying it outside evidence-impairment context and "to facially-lawful acts taken by public officials exercising … their discretionary powers").

In short, the plain language of the statute makes clear that Congress did not intend that the conduct alleged in the indictment falls within the sweep of either § 1505 or § 1512(c)(2), and certainly did not intend that these statutes could be used to force a state court officer to help the federal government enforce federal immigration law.

## II.     THE APPLICATION OF THE FEDERAL OBSTRUCTION STATUTES TO COURT OFFICER MACGREGOR WOULD VIOLATE THE CONSTITUTION

### A.     Multiple Canons of Statutory Construction Require The Court To Construe The Obstruction Statutes In A Manner Consistent With The Constitution

To the extent there is any ambiguity as to whether the obstruction statutes encompass alleged interference with a federal immigration investigation, longstanding substantive canons of statutory interpretation dictate the same result: The statutes do not apply to the crimes that Court Officer MacGregor is alleged to have committed.

To the extent any doubt remains about the meaning of the statute, as the Supreme Court emphasized earlier this year, the rule of lenity instructs that "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"—a rule "'not much less old than' the task of statutory 'construction itself.'"  *Davis*, 139 S. Ct. at 2333 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)).  That principle carries additional force in the

context of the obstruction-of-justice statutes, as the Supreme Court has emphasized.  *See, e.g.*, *Arthur Andersen*, 544 U.S. at 703-704 ("restraint in assessing the reach of a federal criminal statute" is "particularly appropriate" in the obstruction context given the possibility that the underlying conduct might be innocuous); *see also Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018).  Here, construing the federal obstruction statutes not to reach a state court officer's exercise of his daily duties comports with the fundamental purpose of that rule—the right of individuals "to fair notice of the law."  *Davis*, 139 S. Ct. at 1333.

**B.      The Prosecution of Court Officer MacGregor Violates The Tenth Amendment**

To construe the federal obstruction-of-justice statutes to apply to a state court officer's failure to assist the federal government in enforcing a federal immigration detainer would plainly violate the Tenth Amendment.  The Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  The Amendment operates both to limit Congress's powers to those enumerated in the Constitution, and to preserve the autonomy and independence of the states.  In recognition of this basic principle, the Supreme Court has held that the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997)—thus guaranteeing the States the "critical alternative" of "declin[ing] to administer" those programs. *New York v. United States*, 505 U.S. 144, 176-177 (1992). Even if the government were able to prove the facts alleged in the indictment at trial, the prosecution of Court Officer MacGregor would amount to an attempt to punish him for what the government itself views as his discretion – and to coerce other state actors into making the opposite decision.

It is indisputable that the federal government cannot *command* Court Officer MacGregor or any other state actor to assist in enforcing federal immigration law. The basic teaching of *Printz* and *New York* is that the federal government may not "command the States' officers" to assist in the administration of a federal regulatory program. *Printz*, 521 U.S. at 935. *See also* M.G.L. c. 221, § 70A (designating court officers as members of state judicial branch with police powers within assigned court). As the federal government has conceded in many contexts, the "anti-commandeering" principle prohibits it from directing state officers to assist in the enforcement of federal immigration law. *See Lunn*, 477 Mass. at 526-27; Defs.' Opp. to Pls. Mot. For Prelim. Injunction at 18, *Ryan v. ICE*, 382 F. Supp. 3d 142 (D. Mass. 2019) (ECF No. 28) (explaining that "ICE courthouse arrests do not require *any* action by state officers' and federal policies do not "compel[] employees of the state criminal justice or judiciary systems to take action or refrain from taking action at all"). The federal government thus could not have *commanded* Court Officer MacGregor to release A.S. into its custody on April 2, 2018.

It is likewise clear that the federal government cannot achieve the same result by casting a command as a prohibition. That is the express holding of the Supreme Court's most recent anti-commandeering decision in *Murphy*. The question in that case was whether a federal statute that *prohibited* states from authorizing certain forms of gambling violated the anti-commandeering doctrine. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1472-73 (2018). The Supreme Court held that it did, describing the difference between a *command* and a *prohibition* as an "empty" one. *Id.* at 1478. In the Court's view, the anti-commandeering rule means only that the federal government may not "dictate[]" what a state "may and may not do." *Id.* After *Murphy*, then—if not before—it is clear that Congress could not enact a statute making it a federal crime to decline to assist ICE in enforcing federal immigration law. That would amount to an end run

around the principle of *New York* and *Printz*: Congress would be seeking to achieve via a prohibition what it could not do via a direct command.

But that is *exactly* the purpose and effect of Court Officer MacGregor's prosecution: to punish him for doing something the federal government cannot require him to do—assist the federal government in enforcing federal immigration laws. According to the government's own allegations, Court Officer MacGregor exercised what the Supreme Court has described as the "critical alternative" guaranteed to state and local officers by the Tenth Amendment: the option of "declin[ing] to administer" a federal program. *New York*, 505 U.S. at 176-77. The Court has repeatedly explained that the federal government may not strip states and localities of that prerogative. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 587 (2012) (Tenth Amendment ensures states "may not choose to participate" in a federal program); *Printz*, 521 U.S. at 909-910 (states may "refuse[] to comply with [a] request" to help administer federal laws). The indictment here not only flies in the face of this settled precedent, it goes much further; under the government's theory, a state officer may be *imprisoned* for exercising that right. Such a theory poses a profound threat to the constitutional balance, effectively "strip[ping] local policy makers of the power to decide for themselves" whether to cooperate with the federal government on an issue of national importance, *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951 (N.D. Cal. 2018); *accord City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 869-872 (N.D. Ill. 2019), while threatening substantial prison time for not doing so.

The government cannot reasonably argue that Court Officer MacGregor's prosecution rests on an allegation or theory that he actively obstructed the ICE investigation, rather than merely remaining neutral, for multiple reasons. For one, as discussed above, the Tenth Amendment does not merely require that states be allowed to *remain neutral* with respect to a

federal scheme; it requires that states and their officers may "decline to administer" that scheme altogether. *New York*, 505 U.S. at 176-77; *accord Printz*, 521 U.S. at 909-10. And, as the government's own allegations illustrate, the line between neutrality with respect to the federal scheme and frustration of that scheme can be difficult to draw. According to those allegations, Court Officer MacGregor faced a choice: he could either follow the alleged court officer custom and practice and bring A.S. back upstairs to release him into the courtroom after meeting with his attorney and interpreter and retrieving his property in lockup, or he could release him out of the back sally-port door. Ind. ¶¶ 14-24. In such a circumstance – again, accepting the facts as alleged in the indictment – the only way for a state officer like Court Officer MacGregor to exercise his right to "decline to administer" federal immigration law, *New York*, 505 U.S. at 176-77, was to allow A.S. to exit the rear sally-port door. Whether on the *public* street in front of the courthouse, or the *public* street at the back, ICE was still able to enforce its detainer. The key difference is that the egress in one direction arguably facilitated the ICE arrest, while the other direction is alleged to have not. Nothing in state or federal law – or even the DHS Policies outlined in the indictment – require a court officer in this situation to choose one manner of egress over another; the government's allegations instead rest upon alleged "custom and practice" used by court officers in Newton District Court. Ind. ¶¶ 11-12.

Basic principles of federalism require dismissal. Prosecuting a state court officer for failing to aid the federal government in enforcing an immigration detainer fundamentally upsets the historic "[r]espect for the independence of state courts" that courts have consistently expressed. *Michigan v. Long*, 463 U.S. 1032, 1040 (1983). Under these basic principles, the federal government may encourage, but it cannot compel or commandeer a state or its officials to enforce federal priorities. *New York*, 505 U.S. at 167-69. At best, the federal government here

expected Court Officer MacGregor to cooperate with ICE's wishes. But an expectation enforced by criminal law is the functional equivalent of an obligation. To permit the government to deploy federal criminal law here is to enable it to do indirectly – by imposing criminal penalties – what it cannot do directly: require state officials to fall in line with federal immigration policies.

### C.     As Applied Here, The Obstruction Statutes Are Unconstitutionally Vague

Finally, at least as applied to Court Officer MacGregor, the obstruction of justice statutes—18 U.S.C. §§ 1505 and 1512(c)(2)—are unconstitutionally vague.  As the Court emphasized just last year, vague laws "contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Davis*, 139 S. Ct. at 2325.  To satisfy the due-process concern on which the vagueness doctrine rests, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The obstruction statutes, at least as applied to Court Officer MacGregor, fail that test.  Sections 1505 and 1512(c)(2) do not by their plain terms inform a state court officer that he may be prosecuted by the federal government for simply failing to facilitate a person's release from the courtroom out the exit a federal officer expected; the government's contrary reading of the statutes all but ensures that "public officials [will] be subject to prosecution, without fair notice, for the most prosaic" acts. *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016). For all of these reasons, the Court should decline to adopt the government's boundless reading of the obstruction statutes and dismiss the indictments against Court Officer MacGregor.

### CONCLUSION

For the foregoing reasons, the indictment should be dismissed under Federal Rule of Criminal Procedure 12(b) for failure to state an offense.

Dated:  September 6, 2019          Respectfully submitted,

                                   /s/Rosemary Curran Scapicchio

                                   Rosemary Curran Scapicchio
                                   The Law Office of Rosemary C. Scapicchio
                                   107 Union Wharf
                                   Boston, Massachusetts 02108
                                   *Counsel for Defendant Wesley MacGregor*


## CERTIFICATE OF COMPLIANCE WITH LR 112.1 and LR 7.1


I hereby certify that counsel have communicated about the subject matter of this motion in an effort to narrow differences prior to filing.


/s/ Rosemary Curran Scapicchio


## CERTIFICATE OF SERVICE


I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies/PDFs will be sent by regular mail/email on this date to those indicated as non-registered participants.


/s/ Rosemary Curran Scapicchio